**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| Dow AgroSciences LLC and Phytogen Seed Company, LLC, <br><br>               Plaintiffs, <br><br> v. <br><br> Robert Lemon and Sotero Ramirez, <br><br>               Defendants. | Case No. 1:19-CV-4303 <br><br> **COMPLAINT FOR DAMAGES, TEMPORARY AND PERMANENT INJUNCTIVE RELIEF** <br><br> **(JURY TRIAL REQUESTED)** |

COME NOW Plaintiffs Dow AgroSciences LLC ("DAS") and Phytogen Seed Company, LLC and hereby state their claims against Defendants Robert Lemon and Sotero Ramirez.

**NATURE OF THE ACTION**

1.      This is a diversity action for misappropriation of trade secrets, breach of contract, conversion, and injunctive relief by Plaintiffs against two former DAS employees, Robert Lemon and Sotero Ramirez, due to Defendants' theft of company property and work for a direct competitor in violation of applicable trade secrets laws and both employees' non-disclosure and non-competition agreements with Plaintiffs.

**PARTIES**

2.      DAS is a limited liability company formed under the laws of the State of Delaware.  One of DAS's two global business centers is in Indianapolis, Indiana.

3.      Phytogen is a limited liability company formed under the laws of the state of Delaware.

4.      Robert Lemon and Sotero Ramirez are both individuals who are residents and citizens of the state of Texas.  Until September 5, 2019, they were employed by DAS.

## JURISDICTION AND VENUE

5.      Plaintiffs' claims arise under the Defend Trade Secrets Act of 2016, 18 U.S.C.

§ 1831, *et seq.*

6.      Plaintiffs' state law claims arise out of a common nucleus of operative fact to the

claim raised under federal law such that exercise of supplemental jurisdiction over all claims is

appropriate.

7.      This Court therefore has jurisdiction over this action under 28 U.S.C. § 1331 and

supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

8.      In addition, complete diversity of citizenship exists in this case.  Both Lemon and

Ramirez are citizens of Texas.

9.      As limited liability corporations, the citizenship of DAS and Phytogen are

determined by the citizenship of their members.

10.     DAS has three members: Mycogen LLC, Centen Ag LLC, and DDP

AgroSciences US DCOMCO, Inc.  The sole member of Mycogen LLC is Centen Ag LLC.  The

sole member of Centen Ag LLC is Pioneer Hi-Bred International, Inc.  Accordingly, DAS is a

citizen of the same states where DDP AgroSciences US DCOMCO, Inc. and Pioneer Hi-Bred

International, Inc. are citizens.

11.     DDP AgroSciences US DCOMCO, Inc. is incorporated under the laws of the state

of Delaware.  Its principal place of business is Indianapolis, Indiana.  Pioneer Hi-Bred

International, Inc. is incorporated under the laws of the state of Iowa.  Its principal place of

business is in Johnston, Iowa.

12.     DAS is therefore a citizen of Delaware, Indiana, and Iowa.

13.     Phytogen has two members: Mycogen LLC and J.G. Boswell Company.  As set forth above, Mycogen LLC is a citizen of the states where Pioneer Hi-Bred International, Inc., is a citizen, which is Iowa.   J.G. Boswell Company is a California Corporation with its principal place of business in Pasadena, California.

14.     The amount in controversy related to each Plaintiff's interest in its claims against Lemon exceeds $75,000, exclusive of interests and costs.

15.     The amount in controversy related to each Plaintiff's common and undivided interest in its claims against Ramirez exceeds $75,000, exclusive of interests and costs.

16.     This Court therefore also has jurisdiction over this action under 28 U.S.C. § 1332.

17.     Both Defendants entered into Loyalty and Confidentiality Agreements with Plaintiffs ("Agreements").  Lemon's Agreement is attached as Exhibit A.  Ramirez's Agreement is attached as Exhibit B.

18.     Venue is proper in this Court because both Agreements provide that "the exclusive venue for any legal action arising out of [the] Agreement[s]" will be the courts in Marion County, Indiana.  Lemon and Ramirez further consented to the personal jurisdiction of courts in Indiana.   (*See* Section 6 of Exhibits A, B).

## BACKGROUND

19.     DAS is an industry-leading agricultural chemical and seed companies dedicated to agriculture.  It works in innovative ways to help farms flourish, increase yield, and create the most productive seeds while simultaneously emphasizing sustainability.

20.     Phytogen sells cottonseed, primarily in the southern United States (including Texas), under the trade name PhytoGen®.

21.     DAS, whose controlling member Mycogen LLC is also a controlling member of Phytogen, provides certain services to Phytogen pursuant to a Service Agreement. Those Services include the provision of DAS-employed personnel to carry out the sale of PhytoGen® cottonseed, including sales representatives and other sales personnel.

22.     With exceptions not relevant to this proceeding, DAS retains ownership of confidential and proprietary information it develops in connection with its provision of services to Phytogen. Phytogen retains the right to use the confidential and proprietary information DAS develops in connection with the Service Agreement.

23.     PhytoGen® cottonseed is sold to cottonseed retailers, who in turn sell cottonseed to growers. Although the sales transaction of PhytoGen® cottonseed is with retailers, developing relationships with both those retailers and the growers, who are the ultimate customers of the PhytoGen® seed and drive retailer purchasing behavior, are key components of Plaintiffs' PhytoGen® sales strategy.

24.     PhytoGen® cottonseed is sold across the United States and is thus a part of interstate commerce.

25.     To that end, DAS employs several people in the role of Territory Manager to promote sales of PhytoGen® cottonseed. These Territory Managers are responsible for developing and maintaining relationships with both growers and retailers in their assigned territories and for driving sales of PhytoGen® seed.

26.     DAS also employs people in the role of Cotton Development Specialist. These Specialists are each assigned to support several Territory Managers to assist them with their sales calls and related activities. Cotton Development Specialists offer technical servicing and support to both growers and retailers, including helping respond to any customer issues; manage and

execute product positioning; and assist with developing trial plots of PhytoGen® product offerings.

27.    In the course of their jobs, both Territory Managers and Cotton Development Specialists have significant contacts and relationships with PhytoGen® growers and retailers. Plaintiffs rely on those personal relationships to develop and maintain goodwill with customers and promote sales of PhytoGen® cottonseed.

28.    The cottonseed market in Texas is highly competitive, with about three significant competitors in the marketplace aside from Plaintiffs.  One of those competitors is Americot, which sells nothing but cottonseed.  Americot's cottonseed is sold under the trade name NexGen®.

29.    Because innovation and customer relationships are critical components to the success of the PhytoGen® product, and because the market is so competitive, Plaintiffs take very seriously their protection of their trade secrets and proprietary business information.

30.    One such protection is the requirement that certain DAS employees—including PhytoGen® Territory Managers and Cotton Development Specialists—enter into non-disclosure and non-competition agreements, which specifically obligate them to protect proprietary information and prohibit certain actions including but not limited to disclosing confidential information and engaging in activities that would give competitors an unfair advantage.

31.    By way of example, Lemon's and Ramirez's Agreements contractually obligated them to, among other things, (1) maintain a duty of loyalty to their employer and its affiliates during their employment; (2) maintain the confidentiality of their employer's and its affiliates' confidential information; and (3) in certain circumstances, refrain from engaging in certain unfair competitive activities for 18 months following their employment termination.  *See* Exhibits A, B.

32.     Ramirez began his employment with DAS on January 6, 1999.  For approximately eight years prior to his resignation, Ramirez held the position of PhytoGen® Territory Manager for a region of Texas that partially borders Louisiana (the "Ramirez Territory").  A territory map showing the Texas territories assigned to Ramirez and other Territory Managers is attached as Exhibit C.

33.     Ramirez was responsible for approximately $12,000,000 in annual sales of PhytoGen® product.

34.     Lemon has a PhD in Agronomy.  Lemon began his employment with DAS on April 4, 2011.  Since he started with the company, he has held the position of PhytoGen® Cotton Development Specialist, supporting Ramirez and three other Territory Managers with territories in South Texas.  Lemon therefore had responsibility for sales in the Ramirez Territory in addition to Territories A, B, and C identified in Exhibit C (together, the "Lemon Territory").

35.     Lemon supported approximately $31,500,000 in annual sales of PhytoGen® product.

36.     Both Ramirez and Lemon received regular admonitions that they must keep confidential and not disclose any confidential and/or proprietary information belonging to DAS or its affiliates.  By way of example only:

> a.     Each employee's Agreement contains a definition of Confidential Information that includes "internally created lists of customers, customer leads or prospects, [and] customer history and analysis", "marketing plans," and "research and development" information, among other categories, and expressly prohibits disclosure of such information (Sections 2.1, 2.3, Exhibits A, B); and

    b.    Each employee received regular training on such topics as data privacy, security awareness, information security, and information protection, and ethics and compliance, all of which reminds the recipients of the training not to disclose confidential and/or proprietary company information.

**LEMON AND RAMIREZ ANNOUNCE THEY ARE LEAVING DAS TO WORK FOR A DIRECT COMPETITOR AND ARE NOT TRUTHFUL ABOUT THE JOBS THEY WILL BE PERFORMING THERE**

37.    Both Lemon and Ramirez reported to Chris Pritchett, a PhytoGen® Sales Leader based in Texas.

38.    On September 3, 2019, neither Lemon nor Ramirez appeared for a regularly scheduled one-on-one telephone meeting with Pritchett that Pritchett had scheduled for that day.

39.    On September 4, 2019, Pritchett received a call from Lemon.  Lemon reported he was resigning from DAS and was calling to give his two weeks' notice.

40.    During that conversation, Lemon informed Pritchett he planned to go work for Americot, but not in a role similar to the Cotton Development Specialist role he had been performing.

41.    Rather, Lemon informed Pritchett he would be working in a global position in research and development and would be focusing on developing product offerings that were "further down the line"—meaning he would not be in a customer-facing role as he had been at DAS.

42.    A few minutes after Pritchett got off the phone with Lemon, he received a text message from Ramirez informing him that he, too, was leaving the company.  When Pritchett talked with Ramirez on the phone shortly thereafter, Ramirez told him he was leaving for

Americot.  Like Lemon, Ramirez told Pritchett he would not be performing the same role he was performing at DAS—rather, he would be going into an Account Manager role.

43.     Pritchett understood Ramirez to be telling him that Ramirez would not be actively selling Americot seed to the growers and retailers with whom he had developed relationships while at DAS, but rather would be responsible for maintaining existing key accounts for Americot.

44.     Given that both Lemon and Ramirez had informed Pritchett they would be working for a competitor, DAS declined to allow both employees to remain employed through their two-week notice period.

45.     Instead, Pritchett informed both men he needed to meet them immediately so that he could collect their DAS company property, including company-issued laptops and cell phones.  Pritchett also informed both men they needed to turn in any hard copies of company information they had in their possession.

46.     On September 5, 2019, Pritchett met individually with Lemon and Ramirez to collect their company property.  Both men turned in their company-issued cell phones and laptops.

47.     Lemon turned in a few pieces of paper to Pritchett.  Ramirez returned no paper copies of documents.

48.     During their meetings with Pritchett on September 5, 2019, both men signed a Certificate of Compliance with Employee Agreement verifying that, having returned their company-issued devices, they did not possess any Confidential Information or Trade Secrets in any form.

49.     By signing these Certificates of Compliance, each employee certified, in relevant

part:

> This is to certify in connection with the termination of my employment with [DAS] that I
> do not have in my possession, nor have I failed to return, any Confidential Information or
> Trade Secrets in any form.
>
> *   *   *   *
>
> Confidential Information and Trade Secrets are items of information relating to the
> Company, its products, services, customers, vendors, and employees that are of great
> competitive value to the Company . . . which are not generally known or available to the
> general public or the Company's competitors . . . [and] includes, but is not limited to: . . .
> product and technical information, such as . . . research and development projects [and]
> customer and prospective customer information, such as the identity of the Company's
> customers and prospective customers.
>
> *   *   *   *
>
> I have been advised that I am obligated to preserve in confidence and not use for my own
> benefit or the benefit of any third party (including any future employer or client) any and
> all Confidential Information and Trade Secrets.

50.     Shortly after Lemon and Ramirez departed the company, Pritchett reviewed the

limited information he could access on the company cell phones he had collected from the two

men and became concerned by what he learned.

51.     Among other things, Pritchett observed that Ramirez's call records showed

Ramirez had spent much of the day on September 5, 2019—his last day of employment—calling

his major PhytoGen® customers. Pritchett also observed that Ramirez's text messages showed that he had been in contact with Americot about working there since as early as July 31, 2019.

52.    Pritchett escalated this discovery to his supervisors at DAS.  DAS thereafter engaged their internal security team and an outside computer forensics expert to examine Defendants' company-issued devices.

53.    The information Plaintiffs collected shows that Lemon and Ramirez (1) knew they were going to leave DAS for several weeks, including during a timeframe when both men attended important strategy meetings; (2) accessed confidential and/or trade secret company information in their last weeks of employment, including uploading such information onto hard drives and flash drives that the men never returned; and (3) in at least Lemon's case, actively tried to conceal his electronic footprints.

**LEMON AND RAMIREZ PLANNED THEIR DEPARTURE FOR WEEKS BEFORE THEY ANNOUNCED THEY WERE LEAVING AND ATTENDED CRITICAL COMPANY STRATEGY MEETINGS IN THE INTERIM**

54.    On July 31, 2019, Ramirez received the following message from David Hicks, the owner of Americot:



55.    On August 1 and 2, 2019, Lemon and Ramirez exchanged the following text messages.

+19793249537 Trey Ramirez

What I will send to hicks. Let me know your thoughts.

August 13 will work.   As you might know Robert Lemon and I work together and have talked in general about different opportunities. Both of us would like to visit with you to learn more about your company and your approach to market. As we both have similar questions and believe this would be more efficient of your time. If you do not agree or feel this is not appropriate we fully understand.

Status: Sent
Delivered: 8/1/2019 7:00:43 PM(UTC-5)

8/1/2019 7:00:43 PM(UTC-5)

Source Extraction:
Logical (1), Logical (3)

+19793247568 Robert Lemon

Si

Status: Read
Read: 8/1/2019 8:51:40 PM(UTC-5)

8/1/2019 8:51:26 PM(UTC-5)

Source Extraction:
Logical (1), Logical (3)

+19793249537 Trey Ramirez

On for the 13th.

Status: Sent
Delivered: 8/2/2019 5:38:35 AM(UTC-5)

8/2/2019 5:38:35 AM(UTC-5)

Source Extraction:
Logical (1), Logical (3)

+19793249537 Trey Ramirez

Hicks wants to change date to August 20 at 1 pm. Open on your calendar!

Status: Sent
Delivered: 8/2/2019 7:11:41 AM(UTC-5)

8/2/2019 7:11:39 AM(UTC-5)

Source Extraction:
Logical (1), Logical (3)



56.     From August 6-9, Lemon attended a Cotton Management Team meeting in Seadrift, Texas.

57.     At this meeting, Lemon and others learned about Plaintiffs' confidential plan with regard to marketing of the PhytoGen® product for the upcoming season, including unpublished

pricing and discounts that PhytoGen® Territory Managers would be authorized to offer growers and retailers.

58.    Also at this meeting, Lemon and others learned about the confidential variable compensation program that DAS planned to offer its PhytoGen® Territory Managers and Cotton Development Specialists for the upcoming year.

59.    The PowerPoint presentation through which this information was shared was marked "Confidential."

60.    The DAS representatives who communicated the information contained in this PowerPoint to the group in attendance reiterated that it was important that PhytoGen® competitors not learn this information or they would gain an unfair competitive advantage.

61.    Pritchett and Pritchett's direct supervisor, Hank King, observed Lemon take a photograph of the PowerPoint slide that contained the unpublished pricing and discount programs using his iPhone.

62.    On August 13, 2019, Lemon and Ramirez exchanged the following messages. "DH" refers to David Hicks, the owner of Americot.

> +19793247568 Robert Lemon
>
> DH seed an opportunity to buy instant equity with us. He's about acquiring talent - CP is a classic example.
>
> Status: Read
> Read: 8/13/2019 10:00:02 PM(UTC-5)
>
> 8/13/2019 10:00:02 PM(UTC-5)

. . .

-13-



63.     On August 16, 2019, Lemon and Ramirez exchanged the following text messages:

+19793249537 Trey Ramirez

Well you wrote your job description. Are $$ far off.....

Status: Sent
Delivered: 8/16/2019 10:42:15 AM(UTC-5)

8/16/2019 10:42:15 AM(UTC-5)

Source Extraction:
Logical (1), Logical (3)

+19793247568 Robert Lemon

No. He made me good offer but I need to cove the additional health care costs. And in this negotiation I'm planning for the best health care plan.

Status: Read
Read: 8/16/2019 10:43:30 AM(UTC-5)

8/16/2019 10:43:30 AM(UTC-5)

+19793247568 Robert Lemon

I'm telling you if I get what I need $$$ I'm gone.

Status: Read
Read: 8/16/2019 10:39:33 AM(UTC-5)

8/16/2019 10:39:33 AM(UTC-5)

Source Extraction:
Logical (1), Logical (3)

+19793247568 Robert Lemon

I'm not gonna stay here and lose $$ opportunity and fight battles I can't begin to win.

Status: Read
Read: 8/16/2019 10:40:15 AM(UTC-5)

8/16/2019 10:40:14 AM(UTC-5)

Source Extraction:
Logical (1), Logical (3)

+19793247568 Robert Lemon

I'm saying this assuming I like what they want me to do.

Status: Read
Read: 8/16/2019 10:41:05 AM(UTC-5)

8/16/2019 10:41:04 AM(UTC-5)

Source Extraction:
Logical (1), Logical (3)

64.    On August 16, 2019, Lemon and Ramirez exchanged the following messages.





65.    On information and belief, the "meeting" and "kickoff" in the foregoing string of messages refers to a territory planning meeting for the PhytoGen® sales team that would be held in San Antonio, Texas from August 27 through 29.

66.    On August 20, 2019, Lemon and Ramirez met with David Hicks to discuss beginning employment at Americot.

67.    After that meeting, Hicks informed Ramirez that he could expect an offer letter to be emailed to his personal gmail account the next morning at 8am:



68.    On August 21, 2019, Lemon sent Ramirez a Microsoft Word document along with the message "Terry sent me job description.  What I told him I wanted to do and what I told him I didn't want to do."

69.    On information and belief, Terry is an Americot employee who corresponded with Lemon and Ramirez about the logistics of the jobs they were being offered at Americot.

-17-

70.    A true and correct copy of the Americot job description Lemon sent to Ramirez is attached as Exhibit D.

71.    Contrary to Lemon's representation to Pritchett that he would be in a "global" role supporting research and development efforts for "products down the road," the job description Lemon sent to Terry contained the title "Senior Agronomist" and identified the following job duties, among others:

- Assist Sales Reps on large grower customer and prospect sales calls to help secure NexGen cottonseed sales
- Maintain strong working relationships with large grower customers across the sales geography
- Help manage any complaints beyond the Sales Reps/Regional Manage
- Ensure efficient protocol implementation and correctly position products in the market place

*See* Exhibit D.

72.    These are all precisely the same job duties Lemon was performing while employed at DAS.

73.    Less than three minutes after Lemon sent the text message attaching his new job description, Lemon and Ramirez exchanged the following texts:



74.     As discussed above, NexGen® is the brand of cottonseed sold by Americot.  On information and belief, in the foregoing string of text messages, Lemon is explaining to Ramirez that he plans to utilize training materials developed by and for the benefit of Plaintiffs in the course of his employment at Americot.

75.     Also on August 21, 2019, Lemon and Ramirez exchanged the following text messages:





. . .

+19793249537 Trey Ramirez

So I signed under Dow agro and affiliates. Not sure what that means. Ok keep me posted.

Status: Sent
Delivered: 8/21/2019 10:19:50 PM(UTC-5)

8/21/2019 10:19:49 PM(UTC-5)

Source Extraction:
Logical (1), Logical (3)

+19793247568 Robert Lemon

Si

Status: Read
Read: 8/21/2019 10:20:29 PM(UTC-5)

8/21/2019 10:20:29 PM(UTC-5)

Source Extraction:
Logical (1), Logical (3)

. . .

+19793247568 Robert Lemon

Big difference between what BB does and what I'll do.

Status: Read
Read: 8/21/2019 10:22:17 PM(UTC-5)

8/21/2019 10:22:17 PM(UTC-5)

Source Extraction:
Logical (1), Logical (3)

+19793247568 Robert Lemon

But DH is the man. So see what he thinks.

Status: Read
Read: 8/21/2019 10:23:32 PM(UTC-5)

8/21/2019 10:23:31 PM(UTC-5)

Source Extraction:
Logical (1), Logical (3)

. . .



76. On information and belief, the "BB" in the foregoing text message string refers to Brooks Blanche, a former DAS employee who left DAS for Americot. When Blanche left DAS, DAS took appropriate measures to ensure he was not unfairly competing with DAS or unfairly contacting customers with whom he had contact as a DAS employee in his new job.

77. On August 24, 2019, Lemon and Ramirez exchanged the following text messages:



78.     On information and belief, in the foregoing text message, Ramirez was explaining to Lemon that, if he left the PhytoGen® sales team "now," he would be able to schedule ride-alongs with growers during their harvest season—apparently the very same growers with whom he had contact while selling PhytoGen® cottonseed—and immediately start selling on behalf of Americot.

79.     From August 27 to August 29, both Lemon and Ramirez attended the PhytoGen® "kickoff" meeting they had referenced in earlier text messages.  At this meeting, Plaintiffs shared highly sensitive confidential marketing and strategy information with those in attendance.

80.     Among other things, meeting attendees reviewed, in significant detail, the purchasing history of most if not all growers in each territory and specifically discussed

marketing and sales strategies with regard to each. This was the first year that Plaintiffs had aggregated sales information that included not just purchase history for PhytoGen®, but also included purchase history for Pioneer branded product lines that were now also offered for sale by DAS—meaning that meeting attendees learned, for the first time, how DAS could offer competitive combinations of products to growers when they had previously only had exposure to PhytoGen® purchase history.

81.    On September 2, 2019, referencing their resignation letters to Plaintiffs, Lemon and Ramirez exchanged the following messages:



82.    On September 5, 2019—their last day of employment with DAS—Lemon and Ramirez exchanged the following text messages:



. . .





+19793247568 Robert Lemon

What did DH day about non compete
Status: Read
Read: 9/5/2019 6:33:38 AM(UTC-5)
                              9/5/2019 6:33:37 AM(UTC-5)

Source Extraction:
Logical (1), Logical (3)

+19793247568 Robert Lemon

Say
Status: Read
Read: 9/5/2019 6:33:44 AM(UTC-5)
                              9/5/2019 6:33:43 AM(UTC-5)

Source Extraction:
Logical (1), Logical (3)

+19793247568 Robert Lemon

I'm gonna call him later to talk about mine
Status: Read
Read: 9/5/2019 6:34:03 AM(UTC-5)
                              9/5/2019 6:34:02 AM(UTC-5)

Source Extraction:
Logical (1), Logical (3)

+19793249537 Trey Ramirez

Did not talk about it
Status: Sent
Delivered: 9/5/2019 6:34:37 AM(UTC-5)
                              9/5/2019 6:34:36 AM(UTC-5)

Source Extraction:
Logical (1), Logical (3)

. . .



## LEMON AND RAMIREZ ACCESS AND TRANSFER CONFIDENTIAL AND/OR TRADE SECRET INFORMATION TO EXTERNAL DEVICES AND WEBSITES IN THE DAYS LEADING UP TO THEIR RESIGNATION

83.     On information and belief, during this five-week-long period during which Ramirez and Lemon determined they would resign from DAS and begin working for a direct competitor, they each accessed and transferred confidential and/or trade secret company information to external devices.

***Robert Lemon***

84.     On August 17, 2019, Lemon inserted a USB flash drive, serial number 058F64656473, into his company-issued laptop.

85.     On information and belief, Lemon transferred or printed confidential, proprietary, and/or trade secret information belonging to Plaintiffs to or from this USB drive.

86.     On August 30, 2019, Lemon inserted a USB flash drive, serial number 461EDB2B, into his company-issued laptop.

87.     On information and belief, Lemon transferred or printed confidential, proprietary, and/or trade secret information belonging to Plaintiffs to or from this USB drive.

88.    On August 31, 2019, Lemon connected an external hard drive, serial number 575834314141364B53334E44, to his company-issued laptop.

89.    On information and belief, Lemon transferred or printed confidential, proprietary, and/or trade secret information belonging to Plaintiffs to or from this external hard drive.

90.    By way of example only, Plaintiffs' review of the activity log related to Lemon's company-issued laptop shows, among other things:

A.    Beginning on August 23, 2019, Lemon downloaded thousands of files to an external hard drive.  The largest number of downloads took place on August 23, 2019 (4,701 files totaling approximately 7 gigabytes) and then again on August 31, 2019 (847 files totaling approximately 4.6 gigabytes).

B.    Plaintiffs have reviewed the file names of the documents Lemon transferred to his hard drive.  Those file names show that many, if not most, of the documents Lemon transferred contain confidential and/or proprietary information belonging to Plaintiffs.

C.    By way of example only, among the thousands of documents Lemon transferred to an external hard drive are documents titled "phytogen edi 2019", "phytogen gpos 71519," "phn trial information.2019" and "2019 ovt core and reniform testing.xls" to this external hard drive.

91.    EDI data contains, for the entire PhytoGen® business, Plaintiffs' "microstrategies" for sales and marketing and includes per-grower and/or per-retailer purchasing history, sales strategies, and other sensitive and confidential information.

92.    "GPOS" refers to "Grower Point of Sale."  GPOS data contains confidential information, including, among other things, confidential purchase history for users of

PhytoGen® cottonseed—including farm name, address, type of seed used, and potentially

pricing history.

93.     The document "phn trial information" document contains confidential information

about a particular subset of PhytoGen® growers that are involved in long-term market research,

focus studies, and the like.

94.     The "2019 ovt core and reniform testing" document contains information about

testing and breeding traits for PhytoGen® cottonseed that has not yet been released to the

market.

95.     On August 31, 2019, Lemon searched "how to move photos from pc to external

hard drive" on his company-issued laptop, "how to transfer photos from photo app to external

hard drive," and "how to transfer photos from computer to external hard drive" on Google using

his company-issued laptop.

96.     Also on August 31, 2019, Lemon searched "how do I move all my photos from

phone to an external hard drive"

97.     On September 4, 2019, Lemon searched "how to backup contacts to iTunes" on

Google using his company-issued laptop.

98.     On September 5, 2019, Lemon connected an Apple iPhone to his company-issued

laptop.

99.     Also on September 5, 2019, Lemon visited the cloud storage site Google Drive

from his company-issued laptop.  Lemon had no legitimate business reason to visit a Google

Drive cloud storage site.

100.    On information and belief, Lemon transferred confidential, proprietary, and/or

trade secret information belonging to Plaintiffs to a Google Drive cloud storage site.

101.    Aside from his company-issued iPhone, Lemon did not return to Plaintiffs any of the removable storage devices and/or the external hard drive that he had connected to his company-issued laptop in the weeks leading up to his resignation.

***Sotero Ramirez***

102.    On August 21, 2019, Ramirez inserted a USB flash drive into his company-issued laptop, serial number AA09093QY7R9MOW2.

103.    On information and belief, Ramirez transferred or printed confidential, proprietary, and/or trade secret information belonging to Plaintiffs to or from this USB drive.

104.    On September 2, 2019, Ramirez inserted two USB flash drives into his company-issued laptop, serial numbers AAH5G5U35OT6G8F7 and 2GH2FFFZ.

105.    On information and belief, Robert transferred or printed confidential, proprietary, and/or trade secret information belonging to Plaintiffs to or from at least one of these USB drives.

106.    On August 12, 19, 20, 28, and 29, and September 2, 4 and 5, 2019, Ramirez visited the cloud storage site Google Drive from his company-issued laptop.  Ramirez had no legitimate business reason to visit a Google Drive cloud storage site.

107.    On information and belief, Ramirez transferred or printed confidential, proprietary, and/or trade secret information belonging to Plaintiffs to or from this Google Drive cloud storage site.

108.    By way of example only, Plaintiffs' review of the activity log related to Ramirez's company-issued laptop shows, among other things:

109.    On August 21, 2019—the day after he met with Hicks—Ramirez transferred approximately 4 gigabytes of data to the external USB flash drive he connected to his company-issued laptop.

110.    Plaintiffs have reviewed the file names of the documents Ramirez transferred to this flash drive.  Those file names show that many of the documents Ramirez transferred contain confidential and/or proprietary information belonging to Plaintiffs.

111.    By way of example only, among the thousands of documents Ramirez transferred to an external flash drive are documents titled "trey_phy forecast tool_2019", "July 2019 gpos report 73018.xls," and "segmentation_phytogen_sep_24_2018.xls."

112.    The "phy forecast tool" document contains formulas a Territory Manager can use to model various sales scenarios and determine which sales strategy or strategies may work best for him during the upcoming year.

113.    As explained above, "GPOS" refers to "Grower Point of Sale" and contains, among other things, purchase history for users of PhytoGen® cottonseed—including farm name, address, type of seed used, and potentially pricing history.

114.    Segmentation data includes confidential sales data aggregated by market segment.

115.    Ramirez did not turn in to Plaintiffs any of the USB flash drives he connected to his company laptop in the days leading up to his resignation.

116.    The information and documents that Ramirez and Lemon viewed, accessed and/or transferred to external storage sites, drives, and devices during their last weeks of employment is confidential.

117.    The information and documents that Ramirez and Lemon viewed, accessed and/or transferred to external storage sites, drives, and devices during their last weeks of employment

constitutes information that derives independent economic value, actual or potential, from not being generally known to, or readily ascertainable by proper means by, other persons who could obtain economic value from its disclosure or use.

118.    The information and documents that Ramirez and Lemon viewed, accessed and/or transferred to external storage sites, drives, and devices during their last weeks of employment is, and was at all relevant times, subject to efforts that are and were reasonable under the circumstances to maintain its secrecy.

**LEMON ACTIVELY ATTEMPTS TO CONCEAL HIS ELECTRONIC FOOTPRINTS**

119.    On August 21, 2019, Lemon searched "how to delete texts permanently on iphone" in Google on his company-issued iPhone.  On August 22, 2019, Lemon searched "how to permanently delete text messages on iphone" in Google on his company-issued iPhone.

120.    On August 23, 2019, Lemon searched "how to permanently delete texts from iphone 6" using Google on his company-issued laptop.

121.    On August 24, 2019, Lemon searched "how to delete text messages from iphone 6" using Google on his company-issued laptop.

122.    At some point before he turned in his company-issued iPhone, Lemon deleted 73 of 76 records of telephone calls from the phone, 416 of 519 iMessage records from the phone, and 494 of 633 records of web history.

123.    On September 4, 2019, Lemon searched "how to delete emails in outlook 10."

**LEMON AND RAMIREZ ARE WORKING IN JOBS FOR AMERICOT THAT ARE THE SAME AS THE JOBS THEY WERE PERFORMING FOR PLAINTIFFS.**

124.    As of October 4, 2019, Lemon and Ramirez are both advertised as part of the Sales Representatives for the South Texas region for Americot.  Lemon is identified as a "Senior

Agronomist" and Ramirez is identified as a "Sales Representative." A screen shot of the Americot Website, available at americot.com/sales-representatives as of the filing of this Complaint, is reproduced here:



125. Lemon and Ramirez are performing jobs for Americot that are the same as or substantially similar to the roles they were performing during their last two years of employment at DAS.

126. Lemon and Ramirez are actively calling on and soliciting their former PhytoGen® customers and using confidential and/or trade secret information belonging to Plaintiffs to gain an unfair advantage on Americot's behalf.

127. Lemon and Ramirez have been assigned to a geographic territory that is the same as or is substantially similar to the geographic territories for which they were responsible when they were DAS employees selling PhytoGen® cottonseed.

128. If Lemon successfully moves even one significant customer account from Plaintiffs to Americot, Plaintiffs reasonably anticipate they each will lose in excess of $75,000 in annual profits.

129.    If Ramirez successfully moves even one significant customer account from Plaintiffs to Americot, Plaintiffs reasonably anticipate they each will lose in excess of $75,000 in annual profits.

**COUNT I – Misappropriation of Trade Secrets**
**Against Both Defendants**
**Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836; Texas Uniform Trade Secrets Act, Tex. Civ. Code § 134A.001 *et seq.*; Indiana Code § 24-2-3-1, *et seq.***

130.    Plaintiffs hereby incorporate by reference its allegations in paragraphs 1–129 of this Complaint as though fully set forth here.

131.    Plaintiffs' internally created lists of customers, customer leads or prospects, customer history and analysis, marketing plans, and research and development information, among other categories and other confidential company information accessed and transferred to an external hard drive by Lemon and Ramirez, are not generally known to the public, and therefore have economic value to Plaintiffs.

132.    Plaintiffs' internally created lists of customers, customer leads or prospects, customer history and analysis, marketing plans, and research and development information, among other categories and other confidential company information accessed and transferred to an external hard drive by Lemon and Ramirez constitute trade secrets of Plaintiffs under the Indiana Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, and the Defend Trade Secrets Act.

133.    Plaintiffs take reasonable efforts to ensure the secrecy of its internally created lists of customers, customer leads or prospects, customer history and analysis, marketing plans, and research and development information, among other categories and other confidential company information accessed by Lemon and Ramirez, including but not limited to, requiring employees

-36-

to sign non-disclosure and non-competition agreements and limiting access to confidential company information.

134.    On information and belief, Lemon and Ramirez have acquired by improper means Plaintiffs' trade secrets in the course of their planning to begin employment and work for Americot with the intent to use and/or disclose Plaintiffs' trade secrets for competitive purposes. Both Lemon and Ramirez knew their actions constituted acquisition by improper means because they took the information without Plaintiffs' permission. Such actions by Lemon and Ramirez constitute misappropriation of Plaintiffs' trade secrets.

135.    Given that Americot is a competitor of Plaintiffs', that, on information and belief, Lemon and Ramirez plan to work and in fact are working for Americot in a capacity that is similar to the capacity in which they were employed by DAS and that, on information and belief, Lemon and Ramirez deliberately harvested a substantial volume of electronic files and data containing Plaintiffs' trade secrets in the days and weeks preceding their resignation, Lemon's and Ramirez's employment with and work for Americot poses a substantial threat that they will inevitably use or disclose Plaintiffs' trade secrets.

136.    Lemon's and Ramirez's actual and continued threatened misappropriation of Plaintiffs' trade secrets has caused and will continue to cause irreparable harm to Plaintiffs for which they have no adequate legal remedy.

137.    The Indiana Uniform Trade Secrets Act, Texas Uniform Trade Secrets Act, and Defend Trade Secrets Act each provide that actual or threatened misappropriation of trade secrets may be enjoined.

138.    Defendants' actual and threatened misappropriation of Plaintiffs' trade secrets will continue unless enjoined.

139.     Defendants' misappropriation of Plaintiffs' trade secrets has been willful and malicious.

140.     Plaintiffs have incurred and will continue to incur attorneys' fees and related costs in prosecuting its misappropriation of trade secrets claim.

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Enter a temporary restraining order or preliminary injunction: (1) enjoining Defendants from, directly or indirectly, disclosing or using any of Plaintiffs' trade secrets or confidential information; (2) enjoining Defendants from, directly or indirectly, accessing, altering, erasing, deleting, duplicating or copying any electronic or hard copy materials containing any of Plaintiffs' trade secrets or confidential information, including, without limitation, any of the e-mail, electronic computer files or other data Defendants downloaded or transferred from Plaintiffs' computer network, computer hard drives, or company-provided email accounts; (3) enjoining Defendants from working for Americot in any position involving the sale of cottonseed or the support of sales of cottonseed to growers or retailers in the geographic territories to which they were assigned at any point during their last two years of employment by DAS; (4) enjoining Defendants from any further contact, whether direct or indirect, with any grower or retailer with which they had contact during their last two years of employment by DAS; (5) ordering Defendants to produce to Plaintiffs for inspection and copying, within five (5) days of entry of the injunction, all devices, computers, storage devices, storage media on which any of Plaintiffs' confidential information is stored; and (6) ordering Defendants to disclose to Plaintiffs, within five (5) days of entry of the injunction, all individuals or entities to whom they provided or otherwise disclosed any of Plaintiffs' confidential information.

B.    After final trial, award Plaintiffs the following relief:

(1)    Enter a permanent injunction: (a) enjoining Defendants, directly or indirectly, from disclosing or using any of Plaintiffs' trade secrets or confidential information; (b) enjoin Defendants' employment by Americot in any position involving either (i) the sale of cottonseed or the support of sales of cottonseed to growers or retailers in the geographic territories to which they were assigned at any point during their last two years of employment by DAS or (ii) contact, either direct or indirect, with any grower or retailer with which they had contact during their last two years of employment by DAS, for at least eighteen months following entry of the injunction; and (c) ordering Defendants to follow a deletion protocol established by the Court to delete and purge all of Plaintiffs' confidential materials from all devices, computers, storage devices, storage media, and cloud storage accounts which Defendants possess or control and on or in which they downloaded or stored any of Plaintiffs' confidential and/or trade secret information.

(2)    Enter judgment in favor of Plaintiffs and against Defendants for the claims alleged herein and awarding to Plaintiffs any compensatory damages according to proof, exemplary damages, attorneys' fees, expenses and costs; and

(3)    Award to Plaintiffs all other appropriate relief.

## COUNT II – Breach of Contract
### Against Robert Lemon

141.    Plaintiffs hereby incorporate by reference its allegations in paragraphs 1–140 as though fully set forth here.

142.    By his conduct alleged herein, Lemon's work, directly or indirectly, with Americot in Texas violates his Agreement, including without limitation those provisions in the Agreements relating to the duty of loyalty, confidentiality, unfair competition, and interference with customers.

143.    Lemon's other conduct, both before and after his resignation from DAS, also violates the Agreement—including without limitation those provisions relating to confidentiality and loyalty.

144.    Public policy does not favor allowing individuals who agreed to confidentiality, non-compete, and non-disclosure restrictions to violate those restrictions.

145.    Plaintiffs have been and continue to be harmed by Lemon's breach of the Agreement.

146.    Unless restrained, Lemon's actions will cause irreparable injury to Plaintiffs' rights and they will have no adequate remedy at law.

147.    Upon information and belief, Lemon is using the information he learned and relationships he developed and/or opportunities he became aware of while employed by DAS for the benefit of Americot.

148.    Contacts by Lemon (or by Americot at Lemon's direction) to Plaintiffs' current or prospective customers and partners could cause Plaintiffs to lose valuable business relationships and diminish the goodwill Plaintiffs have established in the cottonseed industry.

149.    The Agreements specifically provide for the award of attorney fees and legal expenses, in the event Plaintiffs prevail in enforcing the Agreement.

150.    All conditions precedent to Plaintiffs' claims against Lemon have been performed, have occurred, or have been excused.

151.    As a direct and proximate result of Lemon's breach of his Agreement with Plaintiffs, Plaintiffs have suffered and will continue to suffer injury to their goodwill, business relationships, and confidential and proprietary information in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully request the Court:

A.    Enter a temporary restraining order or preliminary injunction: (1) enjoining Lemon from, directly or indirectly, disclosing or using any of Plaintiffs' confidential information as that term is defined in the Agreements; (2) enjoining Lemon from, directly or indirectly, accessing, altering, erasing, deleting, duplicating or copying any electronic or hard copy materials containing any of Plaintiffs' confidential information, including, without limitation, any of the e-mail, electronic computer files or other data Lemon downloaded or transferred from Plaintiffs' computer network, computer hard drives, or company-provided email accounts; (3) enjoining Lemon from working for Americot in any position involving the sale of cottonseed or the support of sales of cottonseed to growers or retailers in the Lemon Territory and any other geographic regions to which he was assigned at any point during his last two years of employment by DAS; (4) enjoining Lemon from any further contact, whether direct or indirect, with any grower or retailer with which he had contact during his last two years of employment by DAS; (5) ordering Lemon to produce to Plaintiffs for inspection and copying, within five (5) days of entry of the injunction, all devices, computers, storage devices, storage media on which any of Plaintiffs' confidential information is stored; and (6) ordering Lemon to disclose to Plaintiffs, within five (5) days of entry of the injunction, all individuals or entities to whom they provided or otherwise disclosed any of Plaintiffs' confidential information.

C.    After final trial, award Plaintiffs the following relief:

(4)      Enter a permanent injunction: (a) enjoining Lemon, directly or indirectly, from disclosing or using any of Plaintiffs' trade secrets or confidential information; (b) enjoin Lemon's employment by Americot in any position involving either (i) the sale of cottonseed or the support of sales of cottonseed to growers or retailers in the Lemon Territory or any other geographic territories to which he were assigned at any point during his last two years of employment by DAS or (ii) contact, either direct or indirect, with any grower or retailer with which he had contact during their last two years of employment by DAS, for a period of at least eighteen months following entry of the injunction; and (c) ordering Lemon to follow a deletion protocol established by the Court to delete and purge all of Plaintiffs' confidential materials from all devices, computers, storage devices, storage media, and cloud storage accounts which Lemon possesses or control and on or in which he downloaded or stored any of Plaintiffs' confidential and/or trade secret information.

(5)      Enter judgment in favor of Plaintiffs and against Lemon for the claims alleged herein and awarding to Plaintiffs any compensatory damages according to proof, attorneys' fees, expenses and costs; and

(6)      Award to Plaintiffs all other appropriate relief.

### COUNT III – Breach of Contract
### Against Sotero Ramirez

152.    Plaintiffs hereby incorporate by reference its allegations in paragraphs 1–151 as though fully set forth here.

153.    By his conduct alleged herein, Ramirez's work, directly or indirectly, with Americot in Texas violates his Agreement, including without limitation those provisions in the

Agreements relating to the duty of loyalty, confidentiality, unfair competition, and interference with customers.

154.    Ramirez's other conduct, both before and after his resignation from DAS, also violates the Agreement—including without limitation those provisions relating to confidentiality and loyalty.

155.    Public policy does not favor allowing individuals who agreed to confidentiality, non-compete, and non-disclosure restrictions to violate those restrictions.

156.    Plaintiffs have been and continue to be harmed by Ramirez's breach of the Agreement.

157.    Unless restrained, Ramirez's actions will cause irreparable injury to Plaintiffs' rights and they will have no adequate remedy at law.

158.    Upon information and belief, Ramirez is using the information he learned and relationships he developed and/or opportunities he became aware of while employed by DAS for the benefit of Americot.

159.    Contacts by Ramirez (or by Americot at Ramirez's direction) to Plaintiffs' current or prospective customers and partners could cause Plaintiffs to lose valuable business relationships and diminish the goodwill Plaintiffs have established in the cottonseed industry.

160.    The Agreements specifically provide for the award of attorney fees and legal expenses, in the event Plaintiffs prevail in enforcing the Agreement.

161.    All conditions precedent to Plaintiffs' claims against Ramirez have been performed, have occurred, or have been excused.

162.     As a direct and proximate result of Ramirez breach of his Agreement with Plaintiffs, Plaintiffs have suffered and will continue to suffer injury to their goodwill, business relationships, and confidential and proprietary information in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully request the Court:

B.       Enter a temporary restraining order or preliminary injunction: (1) enjoining Ramirez from, directly or indirectly, disclosing or using any of Plaintiffs' confidential information as that term is defined in the Agreements; (2) enjoining Ramirez from, directly or indirectly, accessing, altering, erasing, deleting, duplicating or copying any electronic or hard copy materials containing any of Plaintiffs' confidential information, including, without limitation, any of the e-mail, electronic computer files or other data Ramirez downloaded or transferred from Plaintiffs' computer network, computer hard drives, or company-provided email accounts; (3) enjoining Ramirez from working for Americot in any position involving the sale of cottonseed or the support of sales of cottonseed to growers or retailers in the Ramirez Territory and any other geographic regions to which he was assigned at any point during his last two years of employment by DAS; (4) enjoining Ramirez from any further contact, whether direct or indirect, with any grower or retailer with which he had contact during his last two years of employment by DAS; (5) ordering Ramirez to produce to Plaintiffs for inspection and copying, within five (5) days of entry of the injunction, all devices, computers, storage devices, storage media on which any of Plaintiffs' confidential information is stored; and (6) ordering Ramirez to disclose to Plaintiffs, within five (5) days of entry of the injunction, all individuals or entities to whom they provided or otherwise disclosed any of Plaintiffs' confidential information.

D.       After final trial, award Plaintiffs the following relief:

-44-

(1) Enter a permanent injunction: (a) enjoining Ramirez, directly or indirectly, from disclosing or using any of Plaintiffs' trade secrets or confidential information; (b) enjoin Ramirez's employment by Americot in any position involving either (i) the sale of cottonseed or the support of sales of cottonseed to growers or retailers in the Ramirez Territory or any other geographic territories to which he were assigned at any point during his last two years of employment by DAS or (ii) contact, either direct or indirect, with any grower or retailer with which he had contact during their last two years of employment by DAS, for a period of at least eighteen months following entry of the injunction; and (c) ordering Ramirez to follow a deletion protocol established by the Court to delete and purge all of Plaintiffs' confidential materials from all devices, computers, storage devices, storage media, and cloud storage accounts which Ramirez possesses or control and on or in which he downloaded or stored any of Plaintiffs' confidential and/or trade secret information.

(2) Enter judgment in favor of Plaintiffs and against Ramirez for the claims alleged herein and awarding to Plaintiffs any compensatory damages according to proof, attorneys' fees, expenses and costs; and

(3)     Award to Plaintiffs all other appropriate relief.

**Jury Demand**

Plaintiffs hereby demand a trial by jury.

-45-

Dated:  October 22, 2019                    FAEGRE BAKER DANIELS LLP

                                            */s/ Harmony A. Mappes*
                                            David A. Given, #15749-49
                                             *david.given@faegrebd.com*
                                            Harmony A. Mappes, #27237-49
                                             *harmony.mappes@faegrebd.com*
                                            Sarah R. Doty, #35007-53
                                             *Sarah.doty@faegrebd.com*
                                            300 N. Meridian Street, Suite 2500
                                            Indianapolis, IN 46204
                                            Telephone: (317) 237-0300
                                            Facsimile: (317) 237-1000

                                            **ATTORNEYS FOR PLAINTIFFS**

US.124922583.03